v. Scott Camp et al., and Jessica Dorhart Van Engen. Good morning. May it please the Court, my name is Jeff Thompson. I'm here today representing Special Agent Scott Lampy in this matter. On September 23, 2014, Special Agent Lampy participated in an investigatory stop of plaintiff Levi Wilson's pickup truck. Lampy had reason to believe that Levi's brother David was in the truck. David was a convicted sex offender who had failed to register as required under Iowa law, who had recently made contact with his teenage victim, and who had made arrangements to meet her at a nearby park. Lamp had been working with local law enforcement for days on a fugitive investigation and was trying to locate David. David was not in the truck. Levi's minor child, M.W., was. Wilson later sued Lamp for damages under 1983. This appeal arises from the District Court's denial of Lamp's motion for I've got relatively short time, so I'd like to focus on two issues with the Court's permission, two key issues. One is the jurisdictional question of whether the Court has jurisdiction over this appeal. And then the second issue is the failure of the District Court and the plaintiffs to identify any single prior case, or any prior case at all, where an officer acting under similar circumstances as Special Agent Lamp was held to have violated the Fourth Amendment as required under the Supreme Court's guidance in White v. Pauley. On the jurisdictional question, I point out that in the very same case, White v. Pauley, the Supreme Court emphasized the importance of appellate review of qualified immunity determinations, stating that not only is it important to society as a whole, but failure to afford an opportunity to review these loses the immunity for people like, and public servants like, Scott Lampy if a court erroneously permits a case to go all the way to trial. As this Court knows, I mean, in Mitchell v. Forsyth, the Court was, I think, very clear that 28 U.S.C. 1291 provides a basis for appellate jurisdiction in this case. Plaintiffs have asserted that a subsequent decision, Johnson v. Jones, deprives the Court of that jurisdiction, specifically because of the Court's reference to disputed issues of material fact. Plaintiffs also cite some Eighth Circuit precedent that follow Johnson, the case Pace 2000, another case Thomas in 2001. In each case, though, this Court said there was no appellate jurisdiction where the challenge was to a factual sufficiency question, dealing with an element of an underlying claim. Similar to the discussion that the Supreme Court engaged in Hartman v. Wilkie, where they distinguished the factual sufficiency issue from the legal question in those cases of the elements themselves or the cause of action. We would focus here and ask the Court to focus on Barron's. We think this case is controlled by Barron's, which is decided after Johnson. And frankly, when you read the language of Barron's and you read the language of Judge Bennett's decision in this case, I think it is absolutely the case that, as the Supreme Court said, that Judge Bennett's qualified immunity in this case necessarily determined that the conduct attributed to Special Agent Lampe constituted a violation of clearly established law. Well, if you take the facts, let's do excessive force. If you take the facts on the excessive force that Levi says, grab the wrist, throw it on the side of the truck, gun pointed at head, gun pointed at child, surely that's true, Your Honor. I mean, I think, I think that, and so here's, here's the pickle here. And I think, you know, the Court has been very clear that these questions of objective reasonableness, this objective standard is fact specific. It's based on facts and circumstances that the officer is confronted with, and it's a totality of the circumstances test. So, I mean, can you go through a laundry list and pick, you know, this case in this situation and this case in another situation, add it all up to, to come up with the circumstances that, that Special Agent Lampe faced? I don't think you get to do it that way. You agree you have to take the facts as Levi says? Yeah, I mean, I want to make sure I'm not, I am not arguing that we disagree with the facts. And I think that what this Court can do and should do is simply look at Judge Bennett's ruling and everything that he says, says is disputed, credit it to the then I think as the cases show that we can set aside the argument about whether you might ultimately decide if you add all those things together that there is a constitutional violation, because that's not the test. The test is, is, is there prior precedent that, that clearly establishes that these circumstances and taken in totality that Special Agent Lampe was faced with is clearly established as a violation of constitutional law. And the Court didn't reference a single case. Plaintiffs has not referenced a single case. And, and what we have here, and we've cited a number of cases that you can look to as, again, pieces that, that indicate that that's not the case. We, we can look to chambers, for example, for this issue about whether you can make an excessive force claim without actual injury. No allegation of actual injury. What about the PTSD on the child? No case anywhere that says that a post hoc diagnosis of PTSD is enough to make out the actual injury requirement at, under the Eighth Circuit or U.S. Supreme Court precedent. I mean, at the time, there was no complaint of injury. There was no evidence of injury. Unlike chambers, where the Court did an exhaustive review of the record and said there were complaints, went to the hospital. There was actually a diagnosis by a doc, doctor of a contusion, de minimis, but an injury nonetheless. And so, you would be plowing new ground if you said, well, we think under chambers, PTSD is enough, because there's no case that said that. Similarly, there, we've cited cases, Edwards, Grider, that, that find that there is not a cause of action that lies for simply having a gun pointed at you. That's another component that they try to add in. On the record before us, it's clear that Levi was fully compliant with the officer's directives, correct? Correct. And part of the excessive force claim is being thrown up against the pickup, which is a use of some level of force, correct? Are there any cases that have demonstrated that similar use of force was found reasonable when the person was completely compliant? Well, the compliance is a difficult, kind of more of a subjective test, but if we've cited Grider and Thomas, both are cases where somebody alleges they were thrown to the ground because they weren't complying, arguably. In Grider, they also complain that they've been pulled from the car. But we have no issue here, because Levi got out of the car, and at least as I read the record, was completely compliant and did exactly what the officers told him to do, correct? With a gun pointed at him? I think that's true, but I think, again, we're still, this is an excessive force claim. There's no injury, in fact. There's no complaint of injury, in fact. I mean, he claims that he was turned and faced in a grab of the wrist. There is no case in the Eighth Circuit that shows that that level of force, I mean, keeping in mind that, that the law is clear, that if you've got a good Terry stop, you have a right to some level of force to affect the stop, and that's, that goes all the way back to Michigan. You've only got a minute left, but boy. I'm running out of time here. I know, I know, but is this any more than a hunch? Does this come down to any more than a hunch? I think it is. Yes, I do. I mean, this isn't like... The drive-away, the drive-away, it was, was 20 miles away or something, right? Well, it was. It was at Sioux Center, is where the drive-away in another vehicle was, and you're saying that says you can stop a here when the driver has the hands out the window as you approach the car. Well, a couple of things. I mean, this isn't like he just saw him driving down the street. They, they were expecting to see David at the park. This was in the proximity of the park. They were expecting to see David meeting the victim. They, they knew... Now, do they have any basis to think David would be at that park? Yeah, from the mother of the victim, who said that there was a plan that she was aware of, that David was going to meet the victim at the park. That's the, the, the specific activity that they're acting on, and so... You meant meet Levi and, and the child there. No, no, no, but, but I think, I think here the other evidence that's real important here is there's undisputed evidence of Levi facilitating this relationship, and so the idea and the evidence that, that, that David was known to drive Levi's vehicles, and so I think you add all that up in a situation where you expect David to be there. You know he's fleeing. You know he's now in flight, and to see a car go by with somebody that could match David's description, plus you know it's Levi's car, and I'm running out of time. One more question, and we got, I know we have the other person coming. Doesn't all that end the moment that the other officer, the one you're not defending from the back, says, oh, that's not him. That's Levi? No. And, and... It does not. It doesn't end there. The suspect here, Your Honor, isn't Levi, right? The reason you've got a Terry stop that's valid is they think David might be there, which is why it is objectively reasonable to maintain control of the situation until they confirm that David's not there. Why was David so potentially dangerous? Well, I mean, he had, the evidence is real clear, and I think undisputed, about a number of priors, including violence, sex, domestic assault. There were no contact orders in place. He, there was evidence in the record, again, about, about his fascination with guns. He had numerous arrests and violations of no contact orders and numerous warrants. I mean, this is somebody, again, in the context of a Michigan v. Long nighttime roadside stop, that it's reasonable for an officer to take precautions. I'm out of time. Thank you, Mr. Tavis. May it please the Court. My name is Doug Phillips, and I represent the other officer involved in this case, Jessica Dorhout-Van Ingen, to whom I will refer as Officer Dorhout. In order, in the time I have available to me, I want to address the hunch. In order to understand whether it's appropriate to apply qualified immunity as it relates to Jessica Dorhout, it's important to look at what she knew and what she did, the totality of the circumstances. We start with the fact that David is Levi's brother. David is wanted for failure to in connection with a conviction for sexually abusing Levi's daughter. There is a no contact order in place. Holly Vlietstra, the child's mother, comes to Jessica Dorhout and says, I have discovered that David is making arrangements to contact my daughter, the victim, in a park here in Orange City in September of 2014. When that happened, Jessica Dorhout asked Agent Lamp to was in route to Orange City to begin surveillance. He heard radio traffic about a drive-off at a gas station in a nearby community. The driver was driving a PT Cruiser. The defendants believed that David was driving a PT Cruiser, so he went there and he confirmed with the clerk, by showing a picture, that it was in fact David who had driven away. That's important because it tended to confirm what Holly said was going to happen that night. David was in the neighborhood. Wait, wait, the drive-offs, how many miles away is the drive-off? A good distance, 15-20 miles, right? Yes. Proceed, go ahead. I can't answer exactly, but 20 is not far off. It's something in that range. Go ahead. But he's not from Iowa. All we have is mom's story that he's gonna be here, he's gonna meet my daughter in the park. Now we know he's really here, and so that's why it's important. Agent Lamp meets Officer Dorhout in Orange City. They continue surveillance until such time as they see that a pickup known to belong to Levi is leaving the area of the park. When that happens, they cannot tell who's driving it. They know because Holly, the mother, has told the officers that Levi frequently allows David to use his vehicles, that this may very well have been a switch. It was reasonable for the officers to believe that David knew the PT Cruiser was now on everybody's radar, that they were looking for it, and that he had every incentive to try to get to a different vehicle, one that his brother could provide him. When the vehicle passed by, the officers couldn't tell who was in it, they couldn't tell who was driving, and for that reason they chose to make the stop to determine whether or not David was in this pickup. Isn't it true that when they, a few minutes later, they did find a PT Cruiser and they didn't jump out of the car with guns a-blazing, they just peered in there to see if David was in there, isn't that? I'm sorry, the PT Cruiser, Your Honor? No, the PT Cruiser was ultimately apprehended some distance away with David in it fleeing. This was apparently a different PT Cruiser that they saw on the road. Oh, I'm sorry, yes, there were two PT Cruisers. But they just looked in the window to see who was in there rather than jump out with the guns out like they did with the pickup, correct? They did not. They did essentially what the court has summarized. They looked in the window and said, move on. With respect to the stop, Jessica Dorhout did get out with her weapon drawn. She had it in what she describes as the low ready position, which means it was pointed to the ground. She was looking for a sexual predator who had violated a no-contact order with a minor victim and who had absconded from the authorities and done so successfully. She approached the passenger side of the vehicle. She concluded that there were no passengers on that side in the passenger compartment and she joined Agent Lamp on the driver's side. When she saw Levi, she said words to the effect, that's Levi. I see that I'm out of time, but I wanted to address that hunch as best I could. Thank you. May it please the court, my name is Michael Jacobs. I represent the plaintiff's office. The primary question for this appeal that this court is presented with is whether federal law clearly established that excessive force can arise when police officers unjustifiably point loaded firearms at an innocent man and his six-year-old son, which results in both of them suffering from and obtaining treatment for PTSD. I would submit to you that federal law does clearly establish this to be excessive force and Judge Recton holding that genuine issues of material fact exist, which precluded summary judgment in this case. It appears as if the defendants are attacking this notion on two fronts, I believe. First, they argue that the conduct of the officers was reasonable just in what they did. And secondly, they basically say that it doesn't really matter whether it was reasonable or not because they say that the plaintiffs really didn't suffer any kind of trauma before they can't make an excessive force claim. So I guess I first want to talk about the issue of the police officer's conduct. Counsel, I don't use your argument however you think best, but what troubles me most is I think they're zeroing in on no clearly established law. We take all the facts favorable to you. Pretty good facts for you. You take all the facts favorable to you. What's the clearly established Eighth Circuit U.S. Supreme Court law that says there's liability? Well, because I think as set forth in my brief, Your Honor, this circuit has on several occasions addressed whether brandishing weapons by police, whether that constitutes excessive force. Now that's in the context of criminal suspect. I think U.S. v. Fisher is probably the best case because in those cases that and Navarrete and U.S. v. Lloyd, in each one of those cases, especially including Fisher, what the court examined was whether or not the police were justified in brandishing their guns by looking at whether there was evidence of serious danger involving potential gun violence that was present. And here in this case, there's nothing anywhere close to that under these circumstances. Judge Bennett discussed this absence of this whether Officer Dorhout had ever been threatened by David or Levi Wilson. You got to help me because as I see the holding of Fisher from your brief is that the officers were OK in approaching Fisher with guns drawn because they had specific information in the case. Yes, they did. And they had specific information that there was guns being used. In that particular case, there was a report that the person whom those police actually just encountered was reported to them that the person pointed a gun at them. And so when they went to investigate and detain that individual, yes, they drew their guns and they had good reason to because there was specific information given to them that that suspect, Fisher, had pointed a gun at that individual. Your opponent said that they had weapons. Well, the only thing that in terms of having weapons was that he had a gun collection. That's the only thing that that in terms of any kind of weapons at all, there's there's no evidence of dangerousness or violence in this case. Mr. Wilson, David Wilson, was wanted on simple misdemeanor warrants, no contact violation. The other issues, the other items that he was wanted for failure to register, failure to appear in court, admitted by the officers do not involve any kind of violence. Jessica Dorhout-Vening and Officer Dorhout herself admitted in the record that there was no evidence of David Wilson being armed with a gun. So there was no reason to when they stopped this vehicle, which was unjustified in the first place, but, you know, putting that aside for a moment, there was absolutely no reason for them to come, you know, blazing at the pickup with their guns drawn when they knew that it was very possible that there could also be small children in it. And in fact, that's also one of the facts that came out from the record was that Officer Dorhout actually knew that my client, Levi Wilson, was taking his son over to the local Casey's there to make an exchange because Ms. Bleedstra had an actual phone conversation with Officer Dorhout telling her that I have to go to Casey's because Levi is dropping off our son to me. And I think one of the biggest glaring facts that shows this court that there was no reasonably, reasonable belief that there was real danger here was because the police were quite comfortable with David Wilson meeting up with a 13-year-old girl in the park. If they thought he was armed and dangerous, there's no way any reasonable officer would allow Mr. Wilson to have an arranged meeting in the park. So I don't think that the facts or the evidence here shows that there is any objective reasonableness on the part of the officers to approach the vehicle the way they did with guns drawn, pointed, loaded at the plaintiffs here. With respect to the injury, the defendants and their argument about the lack of injury and that there is no physical injury, the state talked to this court about it. The court in Chambers shifted the focus from the extent of the injury to the reasonableness of the force applied. So the shift was from de minimis injury to de minimis force in that case. And pointing a loaded firearm at the plaintiffs and screaming at him, I would argue, is not de minimis force. In fact, one of the cases I cite in my brief to the court is from the Tenth Circuit, Holland v. Harrington, which has addressed whether a 1983 action can stand for simply pointing weapons at a plaintiff. I would just like to quote for a moment from that. That case stated, the display of weapons and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. So that can't be considered just de minimis force when you have a loaded firearm pointed at you with the threat that you could die. Now the requirement in this circuit, and I disagree with opposing counsel where he said that there is no case that says that PTSD can be served as an injury for an excessive force claim. Dawkins v. Graham, which is a 1995 case, did specifically reference that PTSD was being suffered by one of the plaintiffs. And I think that's a very well-qualified immunity for having suffered an actual injury. And I think what the standard is in the Eighth Circuit is that there be an actual injury, which PTSD can serve for that. And not only that, with respect to this idea of a physical injury, I think the record shows that the PTSD suffered by the plaintiffs in this case also had physical effects to them. I mean, the record shows that with respect to M.W., he was being deprived of sleep. He had nightmares because of the PTSD that he suffered. Levi, the record shows he had migraine headaches, sleep deprivation, loss of appetite. He had to be hospitalized because of potential self-harm to himself. So I think these are definitely real injuries that can serve as a for an excessive force claim. Does the record show how many times Levi had been arrested? How many times Levi had been arrested? I don't know if the record shows that. I think there was one other time. At least one. At least one that he had been arrested, yes. Now, with respect to the stop of Levi's truck, obviously the defendants argue that they should have qualified immunity regarding that. But I believe Judge Bennett was correct in holding that there's issues of fact for that, that this was nothing more than really a hunch that was prohibited by Terry v. Ohio. You know, one of the issues that generating this factual dispute was whether the officers knew of Levi's presence in the parking lot. I referenced this earlier about how there was an actual phone conversation with M.W.'s mother and Jessica Doerhof-Beningen regarding his transporting him from the Boy Scout Lodge over to Casey's. But the record also shows that the information the police had was that David Wilson was driving a PT cruiser, which looks nothing like a pickup. And there was never any report that a PT cruiser was ever seen driving anywhere around Veterans Park. So this idea that there could have been this switch somehow is just not barren out by any of the evidence. Now, also one thing I'd like to just address briefly as well is what this driving while black charge that, as the plaintiffs call it. And the state is trying to say that the plaintiffs are calling Agent Lamp a racist and so forth. Well, no, we're not saying that he's a racist. But it's very, very clear, I believe, from the evidence that really the only characteristic that matched the description of the suspect here in terms of why they decided to stop the pickup was that they could see that the driver was dark-skinned just like David Wilson. And I think the case law is clear that skin color cannot serve as the sole basis to stop a vehicle. It can be part of a description council, can it? Absolutely, it can. That's part of it. They look like his brother. They're brothers, right? They are brothers. Yes. Boy, that's pretty good, don't you think? That in terms of looking at in terms of you can't tell who's driving and their brothers. Well, you can't tell who's driving. That's not the weak part of it, right? Pardon? That's not your best point, right? No, no, it's not. But it was, I believe, a seize first and identify second type of arrangement here. I mean, they didn't know who was driving, so they just go ahead and stop them. I mean, you know, I think they needed more, much more evidence than that. The clearest violation probably, however, was after the stop when they decided to do the pat-down search of Levi's person. I mean, this happened after they found out it wasn't David who was the person they're looking for. I mean, there was no reason at all to do a pat-down search of Levi Wilson at that point. There was absolutely no evidence of any dangerousness or presence of weapons, which is what the standard is in order to do a pat-down search in a Terry stop from Terry versus Ohio and the other cases that follow that. And they would have required that suspicion to do a search of the cab of the truck too, correct? Absolutely. I believe that's why that was unjustified as well, Your Honor. So in sum, I think that Judge Bennett was correct. I think there are factual issues of dispute that Judge Bennett pointed out. He didn't point out every single one of them, of course, in his ruling, because I think there are many of them. But Judge Bennett was correct in his ruling. This case should proceed to jury trial, and this Court should affirm Judge Bennett's holding denying summary judgment. Counsel, don't our cases say in a case like this, and maybe Judge Bennett does this on three and four, but don't we say, and we've remanded cases where the district judges do not set out the facts, they'd be favorable to you, don't set out the facts in their order. Do you think pages three and four is enough on that? Well, I think it's sufficient. I mean, could it have been more complete? Could it have been greater detailed? Yes, it could have, especially with a record as lengthy as this. But I think it's sufficient for this Court to still affirm. And there are facts on pages one and two? Yes, absolutely. There are facts detailed on pages one and two, the ones he pointed to specifically on some of the issues. Not like we typically see. What we typically see are a lot of facts favorable to you. I would agree with you. Which you would probably like on appeal. Go ahead. I would, yes. Yes, Your Honor. But I do think this is still adequate. I think it's adequate for the have been generated. So I'll conclude. Given in their argument they were willing to take the facts as stated by the plaintiff, do you agree then that we have jurisdiction? Well, I would say, Your Honor, that that's of course the standard because they have to take the facts favorable to the plaintiff. But they seem to, I think in their arguments, they seem to keep reciting disputed facts all the time. For example, I mean, you know, they take, they try to point to the Court that, well, Levi Wilson had been known to let his brother use his car. Well, that's a disputed fact. I mean, that's not a fact that is undisputed favorable to them. That's a disputed fact. So I think they're trying to argue disputed facts. And I guess that's why I argued that there was no jurisdiction in this case, as it appeared to me, that they're simply trying to say that on this record there wasn't sufficient facts to generate a jury question, which is not what the Court can do on interlocutory appeal. Thank you. Okay. Thank you for your argument. I think the appellants have used their time. If you have something really quick that one of you want to say, I'll give you one minute. Very good. You got one minute. Judge Benton, the best case on guns, Edward v. Giles, that says it's not enough to point. And I would also point out that the reasonable suspicion evidence that this Court upheld was fled from police, hid to avoid capture. Well, I have to find it. I'm moving quick here. The best case on injury, he was talking about Dawkins. Dawkins is actually a case that applied an actual injury standard prior to Chapman. But in that case, in addition to the PTSD, there were bruises, facial lacerations, and the plaintiff was taken to the hospital. And the best case on your question about should it have stopped when David didn't get out of the car is Thomas. Thomas is the van search, where they found it reasonable to go ahead and look beyond what they could see into the van to make sure that the suspect or nobody else was inside. Thank you for the extra time. Counsel, we appreciate your arguments and briefing, and we'll issue an opinion in due course.